The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Happy to hear argument in number 20-17-67, J.R. v. Walgreens. Mr. Moore. Thank you. Good afternoon, President Judge Botch, members of the Court, and may it please the Court. I'm Michael Moore on behalf of the plaintiffs in the Walgreens case. We are here basically because of the District Court's granting of a motion to dismiss a class action case, a negligence case, that we filed in the District of South Carolina. I know that I received a question from the Court, and we did, asking to talk about standing, and I want to assure you I want to do that head-on, and we'll do that. Let me address maybe a couple of points in preface to that. Very simply, this is a privacy case. This is about the sanctity of health care records, and who should have access to them and who should not have access to them. And we plead basically every cause of action you could plead in the State of South Carolina that plaintiffs may have to protect their pharmacy records, including state legislative actions, the Prescription Information Privacy Act. We plead negligence, plead basic negligence, negligence per se, as we file this complaint. And as I was thinking about this case in the briefing, and looking at the briefs in preparation for today's argument, it occurred to me that if the District Court is right in the State of South Carolina, if you have your prescription filled at a big-box retailer that happens to also house a pharmacy, anybody within that big-box retailer would be authorized to have access to your personal health information, your prescription information, and we just simply submit that cannot be the law. The heartbeat of our case is really found in privacy, in negligence, and negligence per se. And I think truly the confusion in the case, and perhaps the District Court's opinion, is a lack of understanding or maybe a lack of realization or parsing apart the idea that there are two boxes that we're talking about. There's the box that is the retail establishment. We talk about Walgreens. You all see that every time you drive down the street, the Walgreens store. We may mistake that for a pharmacy. It's actually a retail store. It is not a health care provider. The pharmacy is a separate entity that is within that box. So it is the box within the box. And that separate entity is governed by state law. The pharmacists are governed by state law. They are state-licensed. They are state-regulated. And that distinction I don't think the District Court necessarily recognizes as we move forward. We're here upon a motion to dismiss. Well, Mr. Moore, you just succinctly tell us with your claims with respect to privacy, whether they're under federal law, state law, or state common law, what is the specific injury that you say your clients have suffered? Yes, Your Honor, we plead privacy under two facets, misappropriation of identity and also a publicity count. We claim and know and have alleged that, in fact, their personal information was taken from them without consent and then disseminated to unauthorized people. Even in our complaint, we say those people are not only unrelated to the pharmacy or unrelated to patient prescription services at Walgreens. So is the bottom line of that that whoever the folks are that work in this 340B complete, your injury is the fact that those people there see this information? Is that your injury? And other persons. What other persons are there? Well, we don't necessarily know at this point because we are at the motion to dismiss stage and we're denied discovery going forward. We know of at least 160 people in the 340B complete program who are not pharmacists, who are providing no healthcare services to the patients, who have nothing to do with the filling of prescriptions, who have nothing to do with pharmacy services relating to refilling the prescriptions, who have nothing to do with the payment of insurance claims related to these patients. As I said, they're not pharmacists, not licensed in the state of South Carolina. These are simply people who work in a separate profit-generating department that Walgreens has set up to try to get drugs at a cheaper cost. Our people are not told they have to be pharmacists. We allege this in the complaint. Walgreens does not even tell its pharmacists that work for them that they are doing this. Isn't that the purpose of this 340B program is to get to the people that are qualified, to get them these low-cost drugs? Well, your Honor, that would be fine if that's where it was going. The 340B program was set up to help these poor hospitals be able to buy drugs at a cheaper price and be able to set off some costs. Since that time, the contract pharmacy model has been put in place. Walgreens is now acting as a contract pharmacy, and they've set up to be the 340B planned administrator. So if you're a 340B patient, it doesn't really matter because they fill your script and move on. If you're a Blue Cross Blue Shield patient with full insurance, they decide if they can make more money off of you, or if it's a better business deal to do it under the 340B plan. And those drugs then, as the statute, 340B statute itself, says the drugs can only be given to eligible patients. They can't be given to you, can't be given to me, but yet they're using our health information to set up this marketing plan so they can market to the hospitals to generate additional revenue as a 340B plan administrator. As I was stating, we're here on the motion to dismiss and contend, of course, that the court did not accept the allegations as true. There is a parallel or a case that's been, I guess, put on hold right now as we brought the action for a preliminary injunction, and the court denied that and we appealed that. And so it's been before your court, but, of course, this appeal would take place first. Let me talk about the standing issue, and I want to face it head-on. And, Judge Age, I sat through some of your earlier arguments. I don't know if it was from your question, but I hope I answered it in a way that will be satisfactory to the court. You asked us to look at the Beck case as well as the TransUnion case. The Beck case, in the simplest terms that I can say, it mostly dealt with what I would call speculative damages off of a stolen or misplaced VA laptop computer. And nobody really knew what had happened. Nobody knew, for instance, where the computer was. Nobody knew if the veteran's private information was actually disseminated out. But rather, it was a class action that was filed, and people said, look, we may have harm here. We ought to have that addressed. And I think this court then addressed the standing issue as it related to damages. TransUnion went a little deeper in the Supreme Court this year, and the court talked about the credit report, which indicated that certain individuals were identified on a terrorist or potential terrorist list. And at the end of the day, the court said, those people who had that information disseminated to another party would actually have standing because that would be the damage. Those people who did not have it disseminated would not be eligible members of the class and would not have standing, and so the class was pared down, as the court knows, by about two-thirds. In this case, we don't have those concerns, and the case before you today is clearly distinguishable. In our case, there is no question, and we've clearly set out in the pleadings how the information is used. Essentially, what happens is every patient who goes to the Walgreens Pharmacy in South Carolina, your information is put into a pharmacy database.  about protecting that information. At the end of every day, that data is then transferred into an enterprise-wide database called EDW, where Walgreens information from abroad is held in a system. The 340B complete computer program then sort of reaches in, messes around, scans the data, sees who has what, who has what insurance, who's went to a hospital here. They have access to your patients, and again, you as the patient are long gone. You've gotten your drugs, you've paid for your drugs, you're long gone. This is done at night, so they then take your information, they scan it, they extract it, they match it, and they then have a profit and drug repurchase scheme that they have contracted with the hospitals, with the 340B covered entity. We attach, as the court knows, a copy of the contract, such a contract, to our complaint the court referenced at certain times. What's of particular interest in that contract, if the court will look at it, and I'll give you the appendix site here in a moment, but Walgreens actually knows they have to act within the pharmacy-patient relationship. They have to abide by the rules that govern that relationship, and that relationship is well established to be that a pharmacist needs to keep patient information confidential. I mean, that's essentially what we expect when we go to the pharmacy. We go in, we go to the little back booth, we have divider walls up, and we sit there and secretly tell the pharmacist that we need something for our overactive bladder or some drug treatment for some sexually transmitted disease or whatever it is. We don't go to the cash register on the front end just because they happen to work at the same company but have access to our health information. And so we believe we've clearly set out that there's harm to everyone here and just tracking the Supreme Court's own language, when Justice Kavanaugh wrote the opinion, he repeatedly used the term disseminate, was the information disseminated to another party. That word appears, this complaint was drafted well before that, but it appears all over the face of our complaint, and the court should have taken those things as true if the motion to dismiss stays. We could not have the opportunity to conduct discovery except for a couple of scant depositions, and even when we attempted to get more as it related to the harm, the finances, we were denied those. Well, Mr. Moore, why don't you tell us what you think your strongest statutory or common law claims are? I think there are two. I think the strongest common law claim is misappropriation, and that is that somebody uses your personal information, your identity, your name, likeness, your private information for their own benefit without your consent. They appropriate it. The district court added an element of publicity. That's not in the common law, and even as you look back through the cases at the district court sites, we've briefed them at length. You'll see that most of the cases are not appropriation cases. You can also look at the restatement of torts, about the elements of the misappropriation claim, but for maybe also some clarity, you can simply look at the South Carolina Code, and in those cases where the court has, talks about appropriation, or the legislature rather, excuse me, talks about appropriation, appropriations means use. It doesn't mean publicity. Oftentimes it may involve publicity, but it's not required to have publicity. But even if, even if you took the district court's interpretation of the common law, we pled publicity. We pled in our complaint that it went to other persons, that it was disseminated information. We didn't get it. Is it a fact-finding issue if we get it? Is it 160 people, or is it more people who it was? But we have pled that the information was disseminated. Just as Justice Kavanaugh talked about it in the opinion, I imagine that when that credit report went to the finance person and they saw it, that was less than the 160 people in a separate division. Again, this was a separate division of Walgreens that was set up. The other, and I think from a state statutory argument, I'd like for the court to consider the Prescription Information Privacy Act. And that was an act passed by the South Carolina legislature who said that a pharmacist cannot transfer information outside of the pharmacy. Period. You cannot do it. And it set forth a litany of exceptions, and those things dealt with things like, well, if they need to contact your insurance company, if they need to reach out to a pharmacist, if you all come at any time of business in Atlanta and you need to have a prescription filled here, then your pharmacist can certainly call the pharmacist here. That would not be a violation of the law. There are some exceptions like that for the health care of the patient. But it also says, and I think it's provision six or section six, you can use it for paying the bills, but for no other reason. You can't do it. Mr. Moore, can I ask you a question about PIPA exception number 11? Because it seems to me that that might apply here. Information disclosing to perform quality insurance, medical records review, internal audits. Why isn't PIPA exception 11 applicable here? Your Honor, the exception 11, there would be no pharmacy audits. It would be necessary. 340B is not a pharmacy program. It has nothing to do with the patient's prescription. It would be nothing to do with the medical records of the patient. The 340B covered entity may have to do an audit, and that's the hospital. But exception 11 actually says they can use it for medical records review or internal audits, but for no other reason. Right, but the statute says or similar program. That's right. The third party makes no other further disclosure of the information. So why wouldn't that be just this kind of case here, like the 340B? Because not everyone who's there would be even a 340B patient. And that relates specifically, we believe, to pharmacy operations, not to the 340B program. They would be taking my health information, for instance, if I'm not a 340B patient, accessing, using it, and otherwise for an audit that they had contracted to do with a third party that had nothing to do with me. If that's the case, then the PIPA really would mean nothing because they could contract away their right to keep my private information within the confines of the pharmacy. I see my time has passed. I reserve some for rebuttal. Thank you. Right. Mr. Hoffman? Thank you, Your Honors. Good afternoon. May it please the Court, Rob Hoffman for Walgreens. The Court obviously asked a question about injury, so I'll start there. And here's how we think about injury. For their claims generally, and I think this applies across the board, we think standing depends on two propositions. First, that some invasion of the right to private medical information is sufficient injury or, in fact, to create a case of controversy under Article III. And two, that they have actually alleged such an invasion. Now, the first proposition seems to us true. Transunion looks for some common law analog, and invasion of privacy has a common law analog in trespass. Indeed, the Court cited Davis v. FEC in Transunion, and that's a case involving requirements to disclose an intent to spend a certain amount of your own personal money on a campaign. And they said that's a case that satisfied the injury requirement precisely because of compelled disclosure of private information. The second proposition, however, is the problem here. Here's what the record shows that they've said about injury. If you go to Paragraph 69 of the complaint, that's the appendix, page 41, that they allege that unauthorized persons can and do access pharmacy customers' personal information. But we know from Paragraph 76, just two pages later, that the allegedly unauthorized access is merely the 160 alleged employees administering the 340B program at Walgreens. They said as much at the motion to dismiss hearing, and that's also at pages 474 to 475 and 491 of the appendix. So their supposed injury depends on the assertion that the 340B program involves unauthorized accessing of their personal information. I know Mr. Moore said today that there are other people, but he was asked point blank whether he knows of anybody else, and he said no. So the injury actually in the complaint is all 340B, and therefore we know from the materials properly before the court that the 340B program does not involve unauthorized accessing of personal information. It does not because what they allege about our 340B program conduct just describes how their information is used to determine how to pay for medications, and they've never denied that. They say we get money from it, but, of course, we make money from dispensing medications through the normal process without using 340B. Here's what they've actually said is the problem with the 340B operation. It's not part of the provider-treatment relationship. They've also asserted, as they did again today, that Walgreens employees administering 340B are not licensed pharmacists. We take all that as true, but that's beside the point because none of that for prescriptions. He says it has nothing to do with them. That's not so. It has everything to do with how prescriptions are priced. Indeed, as we've made clear in our brief, plaintiffs have conceded that our 340B program is part of a payment system. That's pages 511 to 513 of the appendix. So here's the key to standing. Plaintiffs have never alleged that use of their personal information for payment processing of prescriptions is an injury, and they couldn't allege that because it's not true. Of course Walgreens can use personal information to figure out how to pay for, how to restock their inventory. So there's no injury here, and there's no case of controversy here. And I think that's the surest and most comprehensive ground for dismissing this case on injury grounds. But I think there are a couple of other potential theories of injury that are worth discussing here, Your Honors. And let me start with the one that's related to unjust enrichment and also to the Mr. Hochman, if I could ask, did you argue in the district court or before today that there was no standing? No, no, that was not argued. And I think that the reason is I think there was allegations were a little bit vague, and it took the process of the litigation, I think, to sort of ferret out how clearly everything focuses on 340B. And then, of course, TransUnion came out, and TransUnion shut the door on a theory of standing that I think could have potentially applied here, which is the mere assertion of a statutorily created right creates an injury unto itself. And since TransUnion closed the door on that, now it's quite clearly the case in our view that on this theory that I just laid out that there is no injury. It's also obviously that argument is also obviously related to some degree. There's some overlap with the merits, but we do think it goes to injury as well. But let me turn to this other potential theory, and it's related to unjust enrichment, also potentially to the misappropriation claim. Plaintiffs seem to be saying that they've alleged injury by alleging that we benefit from using their personal information in connection with the 340B program. This is the so-called secondary financial analysis. They say we perform. Now, the same theory also relates to wrongful appropriation, as I said. They assert that we decide whether to treat a prescription as 340B or not depending on which way we profit more. Now, there are two problems with this. First, and yet again, in light of the material properly before the court, we know that the assertion is wrong. And the relevant part of the contract pharmacy agreement is actually at page 102 of the appendix. It's an exhibit to the complaint. And if you look at that page, that's where the sort of secondary financial analysis is laid out. And you'll see that that calculation has nothing at all, nothing to do with comparing what Walgreens could make if the prescription were a 340B transaction compared to what it would make if it wasn't. The agreement makes clear that the payment calculation Walgreens carries out depends on whether the patient is insured or not. And there are two different calculations depending on that. I can walk you through them. If you look at paragraph 2 of that page, that's what happens if there's an insured patient. The calculation there is entirely about figuring out whether the covered entity, not Walgreens, the covered entity would be made worse off if the prescription were treated as a 340B transaction. Now, remember, from the point of view of injury, what's important here is if you're an insured patient, whether it's a 340B transaction or not, you're paying the insurance copay. You are unaffected, so that's another injury problem. So what happens afterward, how the backside is priced for the drug and reimbursement, that's indifferent to you. And what happens is the covered entity pays if it's a 340B transaction, this is laid out, pays Walgreens its fees, but the covered entity gets to keep the difference between the reduced drug price through the program and any insurance reimbursement. The contract just requires us to make sure that that amount, the amount the covered entity will get, exceeds the amount it has to pay in fees to Walgreens. It is so long as the covered entity comes out ahead on the transaction, the prescription is treated as a 340B program transaction. And that makes sense, as you noted. The point of the program is to ensure that there's a greater amount of resources available to these covered entities that are serving hard-to-reach populations.  That's paragraph one. And the secondary financial analysis there is the literal opposite of injury to customers. Walgreens must choose the option that leaves the customer paying less. For 340B prescriptions, uninsured patients pay our fees in addition to that reduced cost of the drug. Now that in some cases might turn out to be more than the retail price of some drugs. And if it is, Walgreens charges the patient the lower retail amount and doesn't treat the prescription under the 340B program. So when plaintiffs complain about this secondary financial analysis, at least with respect to uninsured patients, they're literally saying they should have paid more. That's what I mean by the opposite of injury. The bottom line is, insured or uninsured, either way, nothing in the contract compares Walgreens' fee, which is what it keeps if it's a 340B transaction, with how much Walgreens would keep if it were not a 340B transaction. The system chooses without regard to that. So, again, there's no actual controversy before the court. There's also a small wrinkle on the breach of contract claim. That's the relevant allegations of paragraph 198 of the complaint, page 65 of the appendix. Plaintiffs say they pay for medical privacy services they didn't receive. I suppose in some sense that's an alleged injury, but I think it's hard to treat as plausibly true. Because what plaintiffs pay, if anything, is determined by their insurance or the retail price of the drug, neither of which are allegedly affected by whether Walgreens provides medical privacy services. So you might consider addressing that as well, although, in fairness, I don't think it's necessary. The last thing I'll say before leaving standing is that the court can consider the propriety of dismissing the parent company, WBA, on personal jurisdiction grounds, even before it reaches the Article III issue. That's what the Supreme Court said in its 1999 decision in RurGas, 529 U.S. 574. If there are no further questions on injury, I'm happy to proceed to the other issues that were briefed in the case. And I'll go through personal jurisdiction very quickly. I think the argument that there's been a waiver here is a non-starter. Rule 12 clearly permits this. The district judge was on notice that we were going to raise personal jurisdiction later. The district judge could have raised a hand and said, sure, we should do that now. We would have complied with that, but everybody decided this was the best way to proceed, the rules allow it. And there's obviously no consent to jurisdiction either because we weren't the ones seeking preliminary relief. We weren't the ones asking the court to do something. We were asking the court not to do something. And as for veil piercing, we've laid out in our briefs why all of the alleged facts are perfectly consistent with the maintenance of corporate formalities. I don't think there's anything to add to that. So let me turn to the merits arguments. And I understand that Mr. Moore focused on misappropriation in PIPA, and I'll say a couple of things about those specifically in a minute. But I actually want the arguments about that and the sort of point-by-point, element-by-element are pretty laid out in detail in the brief. So I want to step back and try and sort of show you the fundamental problem with the claims. And it was repeated again today by Mr. Moore. And all of their claims fail, every single one fail, because they depend on their off-repeated assertion that the 340B program conduct they're complaining about is not pharmacy operations. You heard it again today. The materials properly before the court now make clear that the 340B conduct at issue obviously is pharmacy operations. What the plaintiffs are complaining about are simply the systems Walgreens has in place to determine billing and payment and inventory for its pharmacies. The only wrinkle, and it is of no moment here, is that Walgreens is sometimes serving as the kind of retail pharmacy you might usually expect, but sometimes it's a contract pharmacy pursuing to agreements with 340B covered entities. Those agreements make Walgreens a kind of in-house pharmacy for those covered entities. But that doesn't matter because there's no question about whether Walgreens is performing pharmacy functions. The 340B software just tells us which kind of pharmacy Walgreens is when it dispenses the prescription. Either way, the same core pharmacy tasks are being performed. The price of the drug is being determined. The patient's insurance payment, if any, is being determined. How much the patient pays, if any, that's being determined. So there's no legal or practical argument or reason for treating Walgreens' systems for billing and payment of its pharmacies as somehow not part of its pharmacy operations. Plaintiffs cite no authority for the highly counterintuitive proposition that billing and payment and drug procurement too, for that matter, are not pharmacy operations. They seem to have in mind that the only operation that can be a pharmacy operation is actually handling the drug. The plaintiff, by no loss, says that it would be absurd. A pharmacy is a business. South Carolina PIPA uses the language of person, which South Carolina law defines as including a corporation. South Carolina is aware that pharmacies are businesses. They have to bill customers. They have to arrange to pay for their inventory. Plaintiffs don't allege that the 340B software does anything but that. And that's true even if you accept that some individuals in some part of the company that plaintiffs call a 340B program division have access to patient information. Plaintiffs cite no rule that requires a pharmacy's billing and payment functions to be carried out through computers or personnel exclusively in the building where the drugs are dispensed. No law traps the pharmacy business in the pre-digital era. Whatever access Walgreens' 340B employees have, there's no allegation they did anything but carry out pricing and billing and inventory functions. And once you see that, every claim of that means. Common law and negligence claims all fail if plaintiffs haven't alleged that Walgreens used their information for something other than billing and payment. They clearly consented to that. That's in the notice of privacy policies that they refer to in their complaint and recited in our brief. The same is true of the pharmacy ethics-based and federal and state law statutes claims. We can talk about PIPA, which is one of the two claims that they mentioned. Judge Keenan, you mentioned the audits. It's absolutely the case that the information that is kept is pursuant to government guidance that we need to keep this information about 340B dispensed prescriptions available to the government for audits. PIPA clearly allows that. But even if you don't get there, Section 6 says payment systems. And that's what this is. They can say it's not a payment system, but what they describe, what it does, is clearly a payment system as a matter of law. And then as for the misappropriation claim, which is the only other claim I'll address unless you have further questions, what I would say there about publication is if you go through the cases, the only argument for why publication is not required for wrongful appropriation is a line ripped from context from the Jinya case. And the way I read that, Jinya itself obviously involved publication. It was using the name of a person on a law firm. There's no question about publication. Everybody agrees that Holloman, which is the case that the seminal privacy case in South Carolina required publication. So why would the South Carolina Supreme Court, in passing, in a case where the issue wasn't presented, be deemed to have suddenly changed the law? And in fact, that's what Snakenberg, the South Carolina Court of Appeals case we rely upon, makes clear it didn't. The difference between the two kinds of claims, wrongful appropriation and wrongful publication, is the nature of the private information at stake. The one on wrongful appropriation has to have some kind of value, and the other, wrongful publication, is just inherently embarrassing information about you, which in the Snakenberg case was quite clear because you were talking about photos taken of people while they were changing clothes. So we think those claims, in addition to all the others, for all the reasons I've discussed, were properly rejected. And whether this court dismisses the case for want of jurisdiction or affirms fully the dismissal, we respectfully request that the court rule in a way that makes clear that it understands that what's at issue here is the payment systems and only the payment systems of pharmacies that Walgreens operates. Mr. Hoffman, you've given us a very elaborate argument, which doesn't rely very heavily on what the district court did. Did the district court, in your view, make mistakes? No. So no. I think a couple things to say about that. First of all, I think what the district court did was, I actually agree with every ground that the district court relied upon. I think the district court also, in various places, made the point that we're making today about pharmacy operations. It's just that it went through in a kind of very, and I give the district court credit, in a very dutiful fashion, element by element. And I don't think there's anything wrong with doing that. I'm just saying, look, you have an injury question in front of you. As the court is well aware, the court has an obligation to satisfy itself that there's actual injury alleged here. So what I'm saying is there's actually a way to resolve this case in one fell swoop like that. But it also, and for similar reasons, there's actually a one fell swoop way to resolve this case on the merits as well in a similar way. You know, the transfer issue under PIPA that Mr. Moore talked about, I mean, it's worth addressing just a minute. Nothing about this case requires you to say that, you know, and give it to somebody stocking shelves in the grocery aisle. This is why I talked about pharmacy operations. And that's what I take the district court's ruling on transfer to be. It's got to be external of the pharmacy operating component of the business. And there's nothing about the 340B program that is alleged to be part of anything but the pharmacy payment and procurement process. And the prospect that maybe they could have discovery to find other people is not a reason to allow the complaint to go on. And because there's no allegation that that actually happened in the end, and the absence of any such allegation, there's both no injury and no claim. Thank you very much. We appreciate it. Thank you, Your Honor. Mr. Moore, do you have rebuttal? Okay, please. Thank you, Your Honor. Let me address a couple of things about pharmacy operations. The one thing that you didn't hear from my friend is that the 340B program is run for the plaintiffs in this case, or that it's run in a way that has anything to do with the pharmacy operations relating to the filling of these prescriptions. In fact, it's a voluntary business venture that Walgreens entered into. And that does not mean, in our opinion, that the plaintiff's privacy rights must suffer because they choose to take a vendor contract as a third party with a covered entity, and then try to use a statute as if they're riding the white horse to keep drug costs cut and such. That has nothing to do with us. But the fact is that I think they've acknowledged they make money. It's a profit-driven thing. They make money on the filling of prescriptions, and certainly on the vendor contract. And that's why appropriation says we have a right, the plaintiffs have a right to control their private information, what it's used for. They could clearly tell, if Walgreens wished to, that they were running a program that was for the greater good. They could put that in their notice of privacy practice. They can have the pharmacist at their locations in a position to be able to tell the customers that come and confide in them their most secret health concerns what might happen to their information. They don't even tell the pharmacist they're doing it. It has nothing to do with pharmacy operations. The pharmacy operates fine. It operated before they had this. It'll operate after they have this. Other people do it. Other people do it right. Walgreens, though, has developed a vendor contract for the covered entities. And they're paid for it. And the way they do it is they market, say we have access to this huge pool of data. And our computer system will check everybody's health information, and then we'll come back in and try to get you some money. And then, by the way, we'll restock our drugs. And what Walgreens does is they restock themselves at less than AWP, the average wholesale price. So they buy drugs cheap. But when Michael Moore goes to Walgreens in Charleston, South Carolina, who has a prescription field, I pay the full price. I get no benefit out of this. The plaintiffs in this case receive no benefit for it. They just get to use their information to say they've put this together. They're going to scan it, and we're going to be able to buy drugs or have the drugs transferred to us. They really can't buy them. Again, I think that's a violation of the federal statute, and I don't think you can violate a statute and then use it as a shield to protect yourself. You cannot give these drugs to anybody but an eligible patient, and that's not what Walgreens is doing. The program was prepared at a time and was set out at a time when you had the hospital and you had the pharmacy down maybe on the first floor, and the patient on the way out who didn't have any money and their mother was picking them up or whatever, they were able to go by the hospital pharmacy. Because they couldn't get their drugs somewhere, they were able to get them cheaper. Walgreens now has figured out a way to take all of our information, put it in their system, market themselves as a vendor for this plan, and then buy drugs cheaper for themselves while charging us the full price. My concern with the PIPA statute is Judge Norton's inclusion of the word external. He added a word to the statute and said that it only applied to external transfers. And the audit question for me, again, deals with whether or not they are doing an audit that's necessary for the pharmacy or whether or not they're doing an audit that they have now contracted for and that somehow, for some reason, they stay in South Carolina because the pharmacy that I choose to go to, that they can now give my information out to unauthorized people because they have contracted with somebody else to do an audit. It has nothing to do with the patient information. I think that the language in PIPA is very clear. I think the timing of it is clear. This would be like Walgreens saying, well, we're going to take your prescription information if you have incontinence and we're going to allow our pharmacy to market out and send out flyers full of the pens. That clearly would be an absurdity to think that that would be allowed within the business context, within the sole corporation context. So we contend that that would be inappropriate. I wanted to say about the harm, and that seems to be a question here. The plaintiffs in this case are not able to negotiate cheaper drugs. They're not able to negotiate for the use of their information. Their privacy is violated, which I think the court would recognize is a harm, and it's often akin to a property right and a trespass, and it's instructive if you look at the TransUnion case and the example that Justice Kavanaugh used between Maine and Hawaii and how he basically talks about a trespass to property and the lady, the homeowner who has the property in California and the plant is a problem next door and her property is somehow affected that she has a claim, but the one who lives in Hawaii, she may have an EPA claim and she may be able to point out, but she's not there. The law doesn't let her come in under Article 3 to say you can just collect some money because somebody happened to violate a rule that has no effect on you. The difference here is that every one of these plaintiffs, every Walgreens customer that we've alleged, we have six names here, but all the class would be, but certainly the plaintiffs before this court have had their prescriptions used by Walgreens, their personal health information actually used by Walgreens and appropriated away without their consent for Walgreens' own benefit. We've pled in the complaint a number of times, and I think it's cited in the brief that we have alleged many times that the information went to other people beyond Walgreens and it went to other persons. That is, to me, what discovery was for, and I think the posture of some of the cases that Walgreens relies on obviously belie the fact that we've made allegations, and that's why the court's supposed to rely on the allegations that we made. We've made allegations that, in fact, this information, their health information, was disseminated to unauthorized people, and I think that is what any statute would require, certainly even the wrong reading of the appropriation statute, certainly the publicity statute, a provision of cause of action. We have alleged that. This information actually leaves the pharmacy in violation of the state statutes. It leaves the pharmacy and goes from the pharmacy database into the EDW database, and then to which the entire corporation, all, however many hundreds of thousands of employees, Walgreens has had access to. That's not placing it in a secure facility. That's not making sure that the data is protected. That's not handling pharmacy patients' data in a way that even under their own 340B vendor contract says they would have to do to maintain the confidential relationships. South Carolina law is clear. There's nothing more sacrosanct than a pharmacist protecting the health information of those customers who come in there to have their prescriptions filled. I think my time has expired. Thank you, y'all. It was a pleasure being with you. Thank you very much. We appreciate your arguments. We'll take the case under submission and ask the clerk to adjourn court. Thank you. This honorable court stands adjourned until tomorrow morning. That's the United States Honorable Court.
judges: Diana Gribbon Motz, G. Steven Agee, Barbara Milano Keenan